WILLIAM PRYOR, Circuit Judge:
*1250 This appeal requires us to decide several issues-including an issue of first impression in this Circuit about the Double Jeopardy Clause of the Fifth Amendment-arising from Isaac Feldman's convictions and sentence for conspiracy to commit wire fraud and conspiracy to commit money laundering. Feldman invested in two Miami Beach nightclubs that hired foreign women to pose as tourists, attract patrons, and persuade them to buy drinks without paying attention to the clubs' exorbitant prices. A grand jury returned an indictment against Feldman and alleged co-conspirators alleging that the nightclubs' activities included regular acts of wire fraud. After a jury convicted the defendants of some counts but acquitted them of others, we reversed their convictions. See United States v. Takhalov , 827 F.3d 1307 (11th Cir.), modified on denial of reh'g , 838 F.3d 1168 (11th Cir. 2016). After a retrial, a second jury found Feldman guilty of conspiracy to commit wire fraud and conspiracy to commit money laundering. The district court sentenced him to 100 months of imprisonment. Feldman contends that his retrial on an alternate theory of the money-laundering-conspiracy charge-for which the first jury verdict was silent-violated his double-jeopardy rights, that the evidence is insufficient to support his convictions, that the indictment's wire-fraud-conspiracy charge was constructively amended, that literary allusions by prosecutors deprived him of a fair trial, and that his sentence is procedurally and substantively unreasonable. We disagree on each point, and we affirm his convictions and sentence.
I. BACKGROUND
A grand jury indicted Isaac Feldman and several alleged co-conspirators for one count of conspiracy to commit wire fraud, 18 U.S.C. §§ 1343, 1349 ; one count of conspiracy to commit money laundering, id. § 1956(h), both by means of financial transactions to conceal the nature and source of illegal proceeds, id. § 1956(a)(1)(B)(i), and by the international transmission of funds to promote unlawful activity, id. § 1956(a)(2)(A); and several counts of wire fraud, id. § 1343. The charges stemmed from the defendants' involvement in a ring of Miami Beach nightclubs at which customers were parted from their money. The ringleader of the alleged conspiracy was Russian businessman and con artist Alec Simchuk, who became a cooperating witness for the government. Feldman, a Miami Beach-area resident and Russian-speaking naturalized citizen, invested in two clubs with Simchuk, Stars Lounge and VIP Diamond Club.
The clubs operated on a business model that Simchuk had developed in Eastern Europe. The basic hustle was for so-called "B-girls," young women from Eastern Europe who worked for the clubs, to pose as partygoing tourists, trawl Miami Beach for eligible patrons-the ideal targets were well-dressed single men using high-value credit cards-and lure them back to the clubs, where they would be led to spend exorbitant sums on drinks for themselves and the B-girls. The indictment charged a panoply of deceptive or underhanded tactics that the B-girls and bartenders used to increase the customers' bills and to keep them unaware of the charges they were incurring: for example, hiding menus, ordering drinks without the customers' knowledge, ignoring customers' inquiries *1251 about prices, lying about prices, hiding the amount on a receipt when requesting a customer's signature, forging customers' signatures, encouraging customers to drink themselves into a stupor, and serving the B-girls shot glasses filled with water when the customers thought they were ordering vodka shots.
Feldman and several alleged co-conspirators pleaded not guilty, and after a joint trial, a jury found Feldman guilty of conspiracy to commit wire fraud. But the jury found Feldman not guilty of the individual counts of wire fraud with which he was charged. The jury also found Feldman guilty of conspiracy to commit money laundering by the international transmission of funds to promote unlawful activity, 18 U.S.C. § 1956(a)(2)(A), but it expressed no finding about conspiracy to commit money laundering by financial transactions to conceal the nature and source of illegal proceeds, id. § 1956(a)(1)(B)(i).
The verdict form provided the jury three options with regard to the money-laundering-conspiracy count: "Guilty (Concealment of Payments)," "Guilty (Transmitting & Receiving Funds Internationally)," and "Not Guilty," arranged as follows:
The district court instructed the jury that it could find Feldman guilty under either or both theories, but it had to agree unanimously about any theory it selected. The jury found Feldman guilty of conspiracy to commit money laundering by international transactions and made no other mark, as the image above reflects.
The district court sentenced Feldman to 100 months of imprisonment, which exceeded Feldman's advisory guideline range. The district court determined that an upward variance was warranted based in large part on its finding that Feldman had committed perjury when he testified in his defense.
We reversed Feldman's convictions on the ground that the district court erred when it failed to give a jury instruction requested by the defendants. See Takhalov , 827 F.3d at 1312-24. The requested instruction would have informed the jury that the B-girls' concealment of their employment relationship with the clubs was not sufficient to establish fraud. See id. at 1311. We held that the district court should have given the requested instruction because it correctly stated the law, dealt with an important matter raised at the trial, and was not substantially covered by the other instructions. See id. at 1315-20. And we held that its denial was not harmless beyond a reasonable doubt because the government had argued that the B-girls' dissembling their employment status was in and of itself an act of fraud, and the jury reasonably could have found that *1252 the defendants lacked any other fraudulent intent. See id. at 1322-25.
The government redacted the indictment to charge Feldman individually with the wire-fraud and money-laundering conspiracy counts of which the first jury had found him guilty. Feldman again pleaded not guilty, and he proceeded to an individual trial.
At the second trial, the gist of the government's case was that Feldman was an involved investor with significant managerial authority over the clubs' activities and finances. Simchuk, the most important government witness, testified about the clubs' business model, the manner in which the B-girls and bartenders fleeced customers out of their money, and Feldman's knowing participation in the scheme. Several B-girls testified about incidents in the clubs and the extent of their interactions with Feldman. And the government presented evidence that Feldman helped manage the clubs' finances through his sister, Alex Burrlader, and his accountant, Kim Marks. Burrlader, who worked as Feldman's bookkeeper, was a signatory of the Stars Lounge bank account and kept records of the clubs' finances in her office at Feldman's realty company, including records of "chargebacks," or payments that credit-card companies rescinded after their customers complained that the nightclubs had billed them for unauthorized charges. Marks testified that he had set up a limited-liability company, Ieva Marketing LLC, in the name of B-girl Ieva Koncilo at either Feldman's or Burrlader's request; Simchuk testified that Feldman had managed the creation of the company and that its purpose was to funnel cash payments to the B-girls without having to pay taxes on their earnings.
Feldman did not testify in his own defense as he had at the first trial. He presented a short character-based defense by calling two business associates and his rabbi to testify that he was a naïve and trusting person who would not willingly have joined a fraudulent scheme. Apart from their testimony, Feldman's defense strategy was to try to establish on cross-examination of the government's witnesses that Feldman had no knowledge of any fraud that took place in the nightclubs and that Simchuk's testimony to the contrary was unreliable.
On two occasions, prosecutors made references to the Charles Dickens novel Oliver Twist and, in particular, the character Fagin, a street criminal who inducted the title character into his band of juvenile pickpockets. During jury selection, the government used Fagin and the children as an example when it asked prospective jurors whether they understood that the ringleader of a conspiracy is guilty of a crime even if he does not personally steal from the targets and whether they would be unwilling to credit a co-conspirator's testimony because he was also a criminal. The government returned to the image of Fagin during its rebuttal closing argument:
I will end with the story of where we began with my colleague .... He talked about the story of Oliver Twist and how the older man, Fag[i]n, would send out his little orphans onto the street to pick people's pockets. Those guys-Fag[i]n wasn't there on the streets picking their pockets. Oleg Simchuk, Isaac Feldman, weren't there when these credit cards were being processed. But did they know it? Did they benefit from it? Absolutely.
Because much of the evidence at the second trial concerned the B-girls' efforts to induce customers to drink to excess, the district court's instructions to the jury included the following paragraph to distinguish *1253 between fraudulent and innocent conduct:
The law does not excuse a patron from his obligation to pay for beverages or goods just because he became intoxicated voluntarily. Even if the establishment uses attractive women to encourage a patron to purchase and consume increasing amounts of alcoholic beverages, the patron is not a victim of fraud when he becomes intoxicated voluntarily and later regrets the purchases. But if the establishment forces the patron to consume the alcoholic beverage, or adulterates the beverage, or allows or encourages the patron to become intoxicated with the intent to charge his credit card for purchases he either is unaware of or is too intoxicated to consent to, then such conduct may constitute fraud [emphasis added].
This instruction was written in part by Feldman's attorney and in part by the district court. At the charge conference, Feldman's counsel asked the district court to give the first part of the instruction. The district court agreed to do so but sua sponte proposed adding the emphasized sentence. Feldman's counsel asked the district court to read the sentence again, the district court did so, and Feldman's attorney said, "All right. I have been overruled by my esteemed colleagues at the defense table and that's fine."
The jury found Feldman guilty of both conspiracy counts, including both money-laundering objects. Using the 2016 edition of the United States Sentencing Guidelines, the district court calculated that Feldman's advisory guideline range was 46 to 57 months of imprisonment based on a total offense level of 23 and a criminal-history category of I. The district court's calculations included an eight-level enhancement based on a loss amount greater than $95,000 but not greater than $150,000, see United States Sentencing Guidelines Manual § 2B1.1(b)(1)(E) (Nov. 2016); a two-level enhancement based on a finding that the fraud involved ten or more victims, see id. § 2B1.1(b)(2)(A)(i) ; a two-level obstruction-of-justice enhancement based on the finding that Feldman committed perjury when he testified at the first trial, see id. § 3C1.1; and a two-level enhancement for "sophisticated" money laundering based on the use of Ieva Marketing as a shell entity, see id. § 2S1.1(b)(3).
Despite Feldman's lower advisory guideline range, the district court again sentenced Feldman to 100 months of imprisonment. The district court explained its view that "a very significant sentence [was] appropriate in light of the scope of this conspiracy, the significant harm that this crime caused to [the] community and the customers and [the local] tourist industry." It also explained its continued belief that Feldman had committed perjury when he testified at the trial, and it remarked that Feldman "ha[d]n't shown any remorse."
II. STANDARD OF REVIEW
Three standards govern our review of this appeal. First, we review de novo an alleged violation of the Double Jeopardy Clause, United States v. Strickland , 261 F.3d 1271, 1273 (11th Cir. 2001) ; the sufficiency of the evidence, United States v. Calhoon , 97 F.3d 518, 523 (11th Cir. 1996) ; an alleged constructive amendment of the indictment, United States v. Sanders , 668 F.3d 1298, 1309 n.9 (11th Cir. 2012) ; and allegations of prosecutorial misconduct, United States v. Noriega , 117 F.3d 1206, 1218 (11th Cir. 1997).
Second, we review alleged errors to which no objection was made at trial only for plain error. See United States v. Gonzalez , 834 F.3d 1206, 1217 (11th Cir. 2016). "To establish plain error, 'there *1254 must be an error that has not been intentionally relinquished or abandoned'; 'the error must be plain-that is to say, clear or obvious'; and 'the error must have affected the defendant's substantial rights,' " which ordinarily requires " 'a reasonable probability that, but for the error, the outcome of the proceeding would have been different.' " United States v. Corbett , 921 F.3d 1032, 1037 (11th Cir. 2019) (alteration adopted) (quoting Molina-Martinez v. United States , --- U.S. ----, 136 S. Ct. 1338, 1343, 194 L.Ed.2d 444 (2016) ). "If these conditions are met, we 'should exercise our discretion to correct the forfeited error if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.' " Id. (alterations adopted) (quoting Molina-Martinez , 136 S. Ct. at 1343 ).
Third, "[w]e review the reasonableness of a sentence for abuse of discretion using a two-step process." United States v. Cubero , 754 F.3d 888, 892 (11th Cir. 2014) (quoting United States v. Turner , 626 F.3d 566, 573 (11th Cir. 2010) ). In the first step, "we look at whether the district court committed any significant procedural error, such as miscalculating the advisory guidelines range, treating the guidelines as mandatory, failing to consider the 18 U.S.C. § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." Id. In the second step, "we examine whether the sentence is substantively unreasonable under the totality of the circumstances and in light of the § 3553(a) factors." Id. We review the district court's legal interpretation of the Sentencing Guidelines de novo . Id.
III. DISCUSSION
We divide our discussion in five parts. First, we reject Feldman's argument that double jeopardy barred the concealment-based theory of conspiracy to commit money laundering. Second, we explain that the evidence is sufficient to support Feldman's convictions. Third, we explain that the wire-fraud-conspiracy count of the indictment was not constructively amended. Fourth, we reject Feldman's argument that the allusions by prosecutors to the character of Fagin from Oliver Twist deprived him of due process. Fifth, we explain that Feldman's 100-month sentence is procedurally and substantively reasonable.
A. Double Jeopardy Did Not Bar the Concealment-Based Money-Laundering Theory.
Feldman contends that he was twice put in jeopardy for conspiracy to commit concealment money laundering because the jury at his first trial did not find that he was guilty under that theory of the money-laundering-conspiracy charge. The Double Jeopardy Clause of the Fifth Amendment guarantees that "[n]o person shall ... be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. "[B]y its terms," the protection of the clause "applies only if there has been some event, such as an acquittal, which terminates the original jeopardy." Richardson v. United States , 468 U.S. 317, 325, 104 S.Ct. 3081, 82 L.Ed.2d 242 (1984).
We have held that when a single count charges two different theories of the offense, a jury's finding that the defendant is not guilty under one theory does not bar retrial under the other theory if the jury fails to reach a verdict about the alternative theory and a mistrial results. See United States v. Rivera , 77 F.3d 1348, 1350-52 (11th Cir. 1996). But Feldman's first jury did not find him not guilty of conspiracy to commit concealment money laundering. Instead, it found him guilty of *1255 conspiracy to commit money laundering by international transactions, and it expressed no finding at all about the concealment theory. So Rivera does not squarely control this appeal.
Feldman's argument resembles the objection made in Green v. United States , 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957). Green was charged with one count of first-degree felony murder, and the trial court instructed the jury that it could convict him of second-degree malice murder as a lesser included offense. See id. at 185-86, 78 S.Ct. 221. The jury found Green guilty of second-degree murder, but its verdict was "silent" with respect to the first-degree charge. Id. at 186, 78 S.Ct. 221. After his second-degree-murder conviction was reversed based on the insufficiency of the evidence, he was retried under the original indictment and convicted of first-degree felony murder. See id. Green argued that his conviction violated the Double Jeopardy Clause.
The Supreme Court held that Green's retrial on the first-degree charge violated the prohibition against double jeopardy in two ways. See id. at 190, 78 S.Ct. 221 ; see also Price v. Georgia , 398 U.S. 323, 328-29, 90 S.Ct. 1757, 26 L.Ed.2d 300 (1970) (discussing Green 's two independent rationales). First, the Court held that it could be "assum[ed]" that the first jury had impliedly "acquitted Green of murder in the first degree" because it had convicted him of the second-degree charge instead. Green , 355 U.S. at 190-91, 78 S.Ct. 221. Second, the Court held that "the result ... need not rest alone on th[at] assumption" because "the jury was dismissed without returning any express verdict on [the first-degree murder] charge and without Green's consent." Id. at 190-91, 78 S.Ct. 221.
Despite a superficial resemblance between this appeal and Green -namely, that Feldman was found guilty of only one part of a complex count by a jury that remained silent about another part and was later dismissed-a closer examination reveals that neither of its holdings applies to Feldman. The original jury did not impliedly acquit Feldman of any offense when it found him guilty of the only crime charged in the relevant count, conspiracy to commit money laundering, under one of two possible theories of liability. Nor did the dismissal of Feldman's jury before it had "return[ed] any express verdict" on the concealment theory, id. , terminate his jeopardy for any offense because Feldman impliedly consented to the jury's dismissal.
The implied-acquittal reasoning that underlies the first holding of Green is subject to two conditions not satisfied in this appeal. First, the Court explained that it is "vital" that the two crimes be "distinct and different offense[s]," id. at 194 n.14, 78 S.Ct. 221, and we join the many federal and state courts that have declined to infer a partial acquittal "[w]hen a defendant is convicted based on one of two [or more] alternative means of committing a single crime," State v. Ben , 2015-NMCA-118, ¶ 12, 362 P.3d 180, 183 (emphasis added) (collecting decisions); see also, e.g. , United States ex rel. Jackson v. Follette , 462 F.2d 1041, 1045-50 (2d Cir. 1972) ; State v. Kent , 223 W.Va. 520, 678 S.E.2d 26, 33 (2009) ; State v. Pexa , 574 N.W.2d 344, 347 (Iowa 1998). Second, we also agree with the courts that "have refused to imply an acquittal unless a conviction of one crime logically excludes guilt of another crime." Commonwealth v. Carlino , 449 Mass. 71, 865 N.E.2d 767, 774 (2007) ; see also, e.g. , United States v. Ham , 58 F.3d 78, 85-86 (4th Cir. 1995) ; Kennedy v. Washington , 986 F.2d 1129, 1134 (7th Cir. 1993) ; State v. Terwilliger , 314 Conn. 618, 104 A.3d 638, 668 (2014) ; State v. Torrez , 2013-NMSC-034, 305 P.3d 944, 948. This limiting principle *1256 follows from the very concept of an implied acquittal; if a defendant's conviction for one offense is equally consistent with both guilt and innocence of another, then it cannot accurately be said to "imply" anything. The Supreme Court agreed with this logic in Cichos v. Indiana , 385 U.S. 76, 87 S.Ct. 271, 17 L.Ed.2d 175 (1966), which dismissed the writ of certiorari as improvidently granted and quoted approvingly the opinion of the Supreme Court of Indiana that "the principle which states silence is equal to an acquittal" was "inappropriate" when a guilty verdict on one charge did not "logically exclude" a guilty verdict on another charge. Id. at 80, 87 S.Ct. 271 (quoting Cichos v. State , 246 Ind. 680, 208 N.E.2d 685, 688-69 (1965) ).
Feldman's retrial did not violate the first holding of Green because the indictment did not charge Feldman with two distinct money-laundering-conspiracies. It instead charged him with a single conspiracy to commit money laundering either by concealment or by international transactions. No matter which underlying offense the jury found Feldman had conspired to commit-or if it found both-Feldman's conviction would be the same: one count of conspiracy to commit money laundering. Nor did the first jury's finding that Feldman conspired to transmit funds internationally to promote wire fraud logically exclude a finding that the same conspiracy embraced the additional purpose to conceal the proceeds of wire fraud. In this circumstance, we can hardly consider the first jury verdict to imply a partial acquittal.
The second and broader holding of Green -that the dismissal of the jury "without returning any express verdict" on the first-degree-felony-murder charge and without the defendant's consent terminated jeopardy, 355 U.S. at 191, 78 S.Ct. 221 -also does not govern this appeal because Feldman implicitly consented to the jury's dismissal. This second holding was based on the rule of Wade v. Hunter , 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949), that "a defendant is placed in jeopardy once he is put to trial before a jury so that if the jury is discharged without his consent he cannot be tried again," Green , 355 U.S. at 188, 78 S.Ct. 221 ; see also Wade , 336 U.S. at 689, 69 S.Ct. 834, barring "unforeseeable circumstances" that require a mistrial, Wade , 336 U.S. at 689, 69 S.Ct. 834. Although Green did not discuss the "consent" element of this rule in any detail, the question when a defendant consents to a jury's dismissal has often arisen in decisions dealing with mistrials, a line of caselaw based on the same rule that Green applied from Wade . See United States v. Jorn , 400 U.S. 470, 484-85, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971) (citing Wade , 336 U.S. at 689, 69 S.Ct. 834, for the proposition that jeopardy terminates when "the judge, acting without the defendant's consent , aborts the proceeding," and explaining that "a motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution" (emphasis added)); see also Arizona v. Washington , 434 U.S. 497, 505, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978) ("The prosecutor must demonstrate 'manifest necessity' for any mistrial declared over the objection of the defendant ." (emphasis added)). We agree with the Fourth Circuit that these contexts demand a unified approach, so "[w]e hold that the double jeopardy rules that apply in mistrial situations also apply when a court fails to try a discrete portion of the case before the original jury." Ham , 58 F.3d at 83.
To whatever extent the district court might be said to have "fail[ed] to try a discrete portion of [Feldman's] case before the original jury," Feldman impliedly consented to that failure. We have long recognized that a defendant's consent to a mistrial "need [not] be express" but "may *1257 always be 'implied from the totality of circumstances.' " United States v. Puleo , 817 F.2d 702, 705 (11th Cir. 1987) (quoting United States v. Goldstein , 479 F.2d 1061, 1067 (2d Cir. 1973) ). At the charge conference during Feldman's first trial, the district court explained its intention to instruct the jury that to return a verdict of guilty on the count of conspiracy to commit money laundering, it needed to find only that the defendants agreed to commit one of the two target offenses. Feldman never voiced any objection to this instruction. Indeed, during deliberations, when the jury asked the district court to clarify whether it could find the defendants guilty under either money-laundering theory or both, Feldman explicitly agreed that the jury "could find [the defendants] guilty of either, or both," as long as the jurors "unanimously agree[d] on the object that they [were] deciding on." And Feldman never voiced any objection to the jury's dismissal after the verdict. The totality of these circumstances compels the conclusion that Feldman impliedly consented to the dismissal of the original jury without its having made a finding about whether he conspired to commit money laundering under the concealment-based theory. And this conclusion suffices to establish that Green 's second holding does not govern this appeal. See Green , 355 U.S. at 188, 191, 78 S.Ct. 221 ; Puleo , 817 F.2d at 705. The Double Jeopardy Clause did not bar the concealment-based theory of conspiracy to commit money laundering.
B. Sufficient Evidence Supports Feldman's Convictions.
Feldman contends that the evidence presented at trial was insufficient to support his convictions, but we disagree. "[I]n reviewing the sufficiency of the evidence underlying a conviction, we consider the evidence 'in the light most favorable to the government, with all inferences and credibility choices drawn in the government's favor,' " and our review "inquires only whether a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." United States v. Broughton , 689 F.3d 1260, 1276 (11th Cir. 2012) (quoting United States v. DuBose , 598 F.3d 726, 729 (11th Cir. 2010) ). Sufficient evidence supports Feldman's conviction for conspiracy to commit wire fraud, 18 U.S.C. §§ 1343, 1349, and his conviction for conspiracy to commit money laundering by concealment and international transmission of funds, id. § 1956(a)(1)(B)(i), (a)(2)(A), (h).
1. Sufficient Evidence Supports Feldman's Conviction for Conspiracy to Commit Wire Fraud.
To convict Feldman of conspiracy to commit wire fraud, 18 U.S.C. § 1349, the government had to prove "(1) a conspiracy to commit [wire fraud]; (2) knowledge of the conspiracy; and (3) that [Feldman] knowingly and voluntarily joined the conspiracy." Gonzalez , 834 F.3d at 1220. The elements of wire fraud are that the defendant "devised or intend[ed] to devise any scheme or artifice to defraud" and that the defendant "transmit[ted] or cause[d] to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice." 18 U.S.C. § 1343 ; see also United States v. Hasson , 333 F.3d 1264, 1270 (11th Cir. 2003). "To prove a conspiracy to commit wire fraud, the government need not demonstrate an agreement specifically to use the interstate wires to further the scheme to defraud; it is enough to prove ... that the use of the interstate wires in furtherance of the scheme was reasonably foreseeable," provided the government "prove[s] that the *1258 defendant knowingly and voluntarily agreed to ... a scheme to defraud." Hasson , 333 F.3d at 1270. A conspiracy charge under section 1349 "does not require the commission of an overt act." Gonzalez , 834 F.3d at 1220.
Feldman admits that the evidence established his agreement to lure customers to the nightclubs using the B-girls, who then used a variety of misleading or deceptive tactics to keep customers from realizing how much they were spending, but he insists that the tactics within the scope of his agreement were not fraudulent under Takhalov and that any fraud the B-girls committed was outside of the scope of his agreement. For example, Feldman admits that "B-girls sought to keep customers from pursuing price concerns," but he argues that "[t]here was no evidence ... that anyone lied to customers about prices" and the bartenders gave customers the drinks they ordered. Feldman also does not dispute that the B-girls committed fraud if they sometimes forged customers' signatures on credit-card receipts, but he points out that even Simchuk testified that such forgeries were not part of the scheme.
We need not review every alleged tactic of the B-girls to conclude that the evidence is sufficient to support Feldman's conviction of this charge. Based on Simchuk's testimony, the jury rationally could have found that Feldman knowingly participated in a scheme to charge customers for drinks they did not order, to lie to customers about the number and kind of drinks they were being charged for, and to lie to credit-card companies about the drinks patrons had ordered. Simchuk repeatedly testified that once a patron made the mistake of providing his credit card to a bartender, it would "be charged for bottles he didn't order," that "this happen[ed] at Stars Lounge," and that Feldman "was aware of this" and knew "exactly what[ ] [was] going on there." Simchuk described a particular ruse in which bartenders would tell patrons that they were receiving two bottles of champagne for the price of one but charge them for both after they accepted the "free" bottle, and although he was describing his clubs in Latvia when he testified about this trick, he testified immediately afterward that he brought "exactly the same system" to Miami. Simchuk also testified that the "bartender's job was [to] open up the tab and clean up the credit card." He used the phrase "clean up the credit card" more than once, and, when the government asked him what it meant, he replied, "That's what I mean, run the credit card until it stopped. ... Just charge it." A rational jury could have inferred from Simchuk's testimony that once a patron provided his credit card to a bartender, it was a foregone conclusion that the club would charge it to the credit limit or to as near the credit limit as possible, no matter how many drinks the patron actually ordered. In Simchuk's words, once a customer ordered even a single drink, "[b]artender went to bar, open up the tab, let the guy sign, that's it, credit card gone."
Simchuk testified about a scheme to commit what qualifies as fraud under any interpretation of the wire-fraud statute, and he testified that Feldman knowingly participated in that scheme. "The jury was entitled to credit his testimony." United States v. Anderson , 782 F.2d 908, 913 (11th Cir. 1986). In considering the sufficiency of the evidence, our only task is to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia , 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Sufficient evidence *1259 supports the jury's finding that Feldman conspired to commit wire fraud.
2. Sufficient Evidence Supports Feldman's Conviction for Conspiracy to Commit Money Laundering.
The jury found that Feldman conspired to commit money laundering in two ways: first, by knowingly "conduct[ing] ... financial transaction[s]" that "involve[d] the proceeds of specified unlawful activity," that is, wire fraud, and that were "designed ... to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds," 18 U.S.C. § 1956(a)(1)(B)(i), and, second, by transferring funds internationally "with the intent to promote the carrying on of specified unlawful activity," that is, wire fraud, id. § 1956(a)(2)(A). Sufficient evidence supports Feldman's conviction under either theory.
The government presented sufficient evidence to establish that Feldman conspired to conceal the ownership and control of funds that he knew to be the proceeds of wire fraud. Simchuk testified that Feldman created a limited-liability company, Ieva Marketing LLC, to facilitate paying the B-girls in cash so as to avoid paying taxes on their salaries and commissions. He explained that the purpose of the company, which Feldman understood, was "to avoid showing the IRS or anyone else looking that [Simchuk and Feldman] had B-girls working for [them]." Kim Marks, Feldman's accountant, testified that he filed articles of organization for Ieva Marketing at the request of either Feldman or his sister and bookkeeper, Alex Burrlader. The articles listed Ieva Marketing's address as the office of Feldman's realty company. Based on this evidence and its rational finding that Feldman knowingly joined a scheme to commit wire fraud, the jury rationally could have inferred that Feldman knowingly conspired to conduct financial transactions that involved the proceeds of wire fraud and that were designed to conceal the ownership and control of those proceeds.
The government also presented sufficient evidence to establish that Feldman conspired to promote wire fraud through international transactions. Simchuk testified that Stars Lounge received investment money from and distributed proceeds to investors in Europe, including Simchuk's mother, Eleonora, and his business partner, Andrejs Romanovs. Simchuk testified that these payments were integral to the functioning of the club because, without the distribution of profits, he and Romanovs would have withdrawn from the enterprise. When Stars Lounge first opened its bank account, the two signatories were Eleonora Simchuk and Burrlader. Simchuk testified that Burrlader's presence on the account was "a part of [the] deal" between him and Feldman because Feldman "want[ed] to make sure [that] he [could] control the bank." Based on this evidence and its rational finding that Feldman knowingly joined a scheme to commit wire fraud, the jury rationally could have inferred that Feldman conspired to transfer funds internationally to promote the wire fraud committed at Stars Lounge.
C. Feldman Can Establish No Reversible Constructive Amendment of the Indictment's Wire-Fraud-Conspiracy Count.
The Fifth Amendment to the Constitution provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. amend. V. This clause does not "permit a defendant to be tried on charges that are not made in the indictment *1260 against him" or convicted on theories that the indictment "cannot fairly be read as charging." Stirone v. United States , 361 U.S. 212, 217, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). The "constructive amendment" of an indictment " 'occurs when the essential elements of the offense contained in the indictment are altered' "-for instance, by a faulty jury instruction-" 'to broaden the possible bases for conviction beyond what is contained in the indictment.' " United States v. Madden , 733 F.3d 1314, 1318 (11th Cir. 2013) (quoting United States v. Keller , 916 F.2d 628, 634 (11th Cir. 1990) ). "An error of this magnitude is per se reversible because it violates the defendant's constitutional right to be tried solely on the charges returned by the grand jury." United States v. Johnson , 713 F.2d 633, 643 (11th Cir. 1983). Constructive amendments should be distinguished from "material variances" between the allegations in the indictment and the proof at trial, which are not reversible per se . See id. at 643 n.9 ; United States v. Salinas , 654 F.2d 319, 323 (5th Cir. 1981).
Feldman argues that the wire-fraud-conspiracy count of the indictment was constructively amended in three ways: by the government's redaction of the indictment, by the district court's jury instructions, and by the government's arguments at trial. He contends that the grand jury indicted only on the fraud theory that we rejected in Takhalov -that the B-girls' concealment of their relationship with the clubs was an act of fraud-so his conviction on any other basis rests on a fraud theory not contemplated by the grand jury. These arguments fail.
First, Feldman contends that the wire-fraud-conspiracy count in the redacted indictment differs from the wire-fraud-conspiracy count in the original indictment "to the point that the prosecution theory diverged from that determined by the grand jury." But the two counts are identical-to the word-in every material respect, so the government's redaction of the indictment cannot have changed the nature of the charge.
Second, Feldman contends that the wire-fraud-conspiracy count was constructively amended by the district court's jury instruction that encouraging customers to drink to overintoxication could be fraud, but the doctrine of invited error bars Feldman from complaining of this instruction. After the district court read its proposed instruction and gave Feldman an opportunity to object, his counsel acquiesced in the instruction, stating, "that's fine." Under our precedent, "when a party agrees with a court's proposed instructions, the doctrine of invited error applies, meaning that review is waived even if plain error would result." United States v. Frank , 599 F.3d 1221, 1240 (11th Cir. 2010) ; see also United States v. Silvestri , 409 F.3d 1311, 1337 (11th Cir. 2005) ("When a party responds to a court's proposed jury instructions with the words 'the instruction is acceptable to us,' such action constitutes invited error." (glossing United States v. Fulford , 267 F.3d 1241, 1246-47 (11th Cir. 2001) )). Feldman cannot obtain reversal based on a jury instruction that he affirmatively accepted, so we need not consider whether the instruction was erroneous.
Finally, Feldman argues that the government's arguments at trial impermissibly broadened the basis for conviction, but this argument fails because the indictment substantially charged every or nearly every potentially fraudulent tactic that the government proved at trial and about which Feldman complains on appeal. To the limited extent that minor discrepancies may exist between the allegations of the indictment and the corresponding parts of the government's evidence at trial-for instance, *1261 one could cavil whether the indictment's allegation that B-girls forged customers' signatures contains the slightly distinct charge, of which evidence was presented at trial, that B-girls sometimes helped guide an intoxicated patron's hand when he was signing a receipt-such details would be grist for a variance argument, not a constructive-amendment argument. See 3 Charles Alan Wright et al., Federal Practice and Procedure § 516, at 45 (4th ed. 2011) ("The term variance applies when the difference between the indictment and proof is relatively slight, and the term constructive amendment applies when the difference is more significant."). And Feldman has not established that any such minor variances in the government's evidence caused him prejudice. See Salinas , 654 F.2d at 323 ("[A] variance in the proof justifies reversal only where the defendant has been prejudiced thereby.").
D. Prosecutorial Allusions to Oliver Twist Did Not Deprive Feldman of Due Process .
Feldman, who is Jewish, contends that he was deprived of due process by several comments in which prosecutors drew an analogy between his conduct and that of Fagin, the street criminal in Charles Dickens's Oliver Twist , who is also Jewish. To be sure, a prosecutor's exploitation of racial or ethnic animus can deprive a defendant of a fair trial, see, e.g. , United States v. Sanchez , 482 F.2d 5, 8 (5th Cir. 1973) (reversing a conviction because the prosecutor's argument was "inflammatory and seriously prejudicial," being "replete with racial and political undertones" that included repeated references to the defendant's "chicannismo [sic]"), but nothing of the kind happened to Feldman.
The government never referred to Fagin's or Feldman's ethnicity, and it is clear from the record that it neither intended to trade nor inadvertently traded on an ethnic stereotype in order to prejudice Feldman. The government first used Fagin as an example when it asked prospective jurors whether they understood that someone who masterminds a crime is guilty even if he employs someone else to commit the crime on his behalf. A few moments later, the government made another fleeting reference to Fagin to inquire whether a prospective juror would be unwilling to credit a witness's testimony just because the witness was himself a criminal. The government referred to Fagin only once more, when, in its rebuttal closing argument, it compared both Feldman and its own witness Simchuk-who, at least as far as the record reflects, is not Jewish-to the Dickensian villain. Feldman did not object to the government's remarks at trial, so we review their propriety only for plain error, see Gonzalez , 834 F.3d at 1217, and under that deferential standard, Feldman cannot establish that the prosecutors' brief, anodyne references to a literary character deprived him of a fair trial and caused him substantial prejudice.
E. Feldman Has Established No Reversible Sentencing Error.
Feldman contends that the district court committed both procedural and substantive sentencing errors. He challenges the eight-level loss-amount enhancement, the two-level ten-or-more-victims enhancement, the two-level obstruction-of-justice enhancement, and the two-level sophisticated-money-laundering enhancement. And he argues that his sentence is substantively unreasonable. We disagree and address these issues in turn.
1. The District Court Did Not Clearly Err when It Applied the Loss-Amount and Ten-or-More-Victims Enhancements.
Feldman challenges both his loss-amount and ten-or-more-victims enhancements.
*1262 The Sentencing Guidelines provide an eight-level enhancement for a loss amount greater than $95,000 but not greater than $150,000. See U.S.S.G. § 2B1.1(b)(1)(E). For purposes of this enhancement, "loss is the greater of actual loss"-that is, "the reasonably foreseeable pecuniary harm that resulted from the offense"-and "intended loss"-that is, "the pecuniary harm that the defendant purposely sought to inflict." Id. § 2B1.1 cmt. n.3(A)-(A)(ii)(I). Pecuniary harm is "harm that is monetary or that otherwise is readily measurable in money," id. § 2B1.1 cmt. n.3(A)(iii), and is reasonably foreseeable if "the defendant knew or, under the circumstances, reasonably should have known," that it "was a potential result of the offense," id. § 2B1.1 cmt. n.3(A)(iv). The Guidelines also prescribe a two-level enhancement for an offense that "involved 10 or more victims." Id. § 2B1.1(b)(2)(A)(i). As relevant to this appeal, " '[v]ictim' means any person who sustained any part of the actual loss." Id. § 2B1.1 cmt. n.1 (subdivision omitted). Because the application of these two enhancements rested on the same evidence, we discuss them together.
The district court did not clearly err when it found that the loss amount was greater than $95,000 and that the number of victims was at least ten. After the second jury found Feldman guilty, the government prepared a list of 52 alleged victims and their alleged actual losses, which totaled $115,404.60. The government explained that the list identified individuals who "either disputed the charges as fraudulent with their credit card companies, were observed by law enforcement officers being defrauded at VIP or Stars Lounge, or confirmed with the U.S. Attorney's office or the FBI that they were defrauded." At the sentencing hearing, Feldman objected that the government had not established that all of the alleged losses resulted from "actionable fraud." But he conceded that if the district court "[went] with what the government's view is," the government's list reflected "the appropriate amount of money that would be indicated in" the evidence. Based on that concession, the district court needed to infer only that it was more likely than not that someone who disputed a charge as fraudulent or was identified as a fraud victim by law enforcement was indeed a fraud victim, and Feldman has not shown that the district court committed clear error in so inferring.
2. The District Court Did Not Clearly Err in Applying the Obstruction-of-Justice Enhancement Based on Its Finding that Feldman Committed Perjury at His First Trial.
The Guidelines prescribe a two-level enhancement for a "defendant [who] willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense," U.S.S.G. § 3C1.1, which includes a defendant's attempt to escape conviction by perjury, see id. § 3C1.1 cmt. n.4(B); see also United States v. Dunnigan , 507 U.S. 87, 92-94, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993). To apply the enhancement based on a defendant's false testimony, "a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, [by] perjury." Dunnigan , 507 U.S. at 95, 113 S.Ct. 1111. That is, the district court must make findings sufficient to establish that the defendant gave "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." Id. at 94, 113 S.Ct. 1111.
*1263 Feldman argues that the findings by the district court were too "generalized," but he overstates its procedural burden. In Dunnigan , the Supreme Court explained that "it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding," but it "is sufficient" when "the court makes a finding ... that encompasses all of the factual predicates for a finding of perjury." Id. at 95, 113 S.Ct. 1111 (emphasis added). And we have explained that "a remand is not necessary" when "the record clearly reflects the basis for [an] enhancement and supports it." United States v. Taylor , 88 F.3d 938, 944 (11th Cir. 1996). At Feldman's first sentencing hearing, the district court stated its finding, "based upon [the] the close attention that [the district court] paid throughout the eleven weeks of the trial, that Mr. Feldman perjured himself on numerous occasions." And the district court found at the second sentencing hearing that Feldman had "commit[ted] specific acts of perjury" "for the same reasons [the district court] articulated at the time of the first sentencing." These findings were adequate as long as the record clearly reflects that the district court found willfulness, falsity, and materiality and that a sufficient basis supports each element. See Dunnigan , 507 U.S. at 94-95, 113 S.Ct. 1111 ; Taylor , 88 F.3d at 944.
The record reflects that the district court found that Feldman's testimony was perjured because it believed that Simchuk's testimony, which contradicted Feldman's on several material points, was "truthful[ ]." To give one of many examples, Simchuk testified at the first trial that he explained to Feldman how Ieva Marketing would work as the cash funnel for the B-girls and that he should arrange to create the company once Koncilo had arrived in the United States. To make sure that Feldman understood the company's function, Simchuk testified that he made Feldman explain to Burrlader exactly how Ieva Marketing was supposed to work. By contrast, Feldman denied under oath that "Simchuk asked [him] to set up a separate company to see to it that the promoters [that is, the B-girls] got paid." Instead, he testified that he referred Koncilo to his accountant to set up a company only because she had asked him to do so.
When a government witness's testimony about material facts "directly contradict[s]" that of the defendant, the district court may credit the government witness's testimony and find that the defendant's was perjured. United States v. Dobbs , 11 F.3d 152, 155 (11th Cir. 1994). The district court did so, and we cannot say that it clearly erred in believing Simchuk over Feldman.
3. The District Court Did Not Err when It Applied the Sophisticated-Money-Laundering Enhancement.
The Guidelines prescribe a two-level enhancement for a money-laundering offense that "involved sophisticated laundering." U.S.S.G. § 2S1.1(b)(3). " '[S]ophisticated laundering' means complex or intricate offense conduct pertaining to the execution or concealment of the 18 U.S.C. § 1956 offense"; it "typically involves the use of fictitious entities; shell corporations; two or more levels (i.e., layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate; or offshore financial accounts." Id. § 2S1.1 cmt. n.5(A) (subdivisions omitted).
The district court did not err when it applied this enhancement based on Feldman's use of Ieva Marketing as a cash funnel for the B-girls' salaries and commissions. Feldman contends that a single-member, publicly registered limited-liability *1264 company providing only one layer of insulation for the clubs' transactions is too simple a means of laundering to qualify for the enhancement, but we have affirmed sophisticated-means enhancements for schemes that were no more complex. See United States v. Campbell , 491 F.3d 1306, 1315-16 (11th Cir. 2007) (defendant used campaign accounts and other people's credit cards to conceal cash expenditures); United States v. Barakat , 130 F.3d 1448, 1457 (11th Cir. 1997) (defendant concealed funds in an attorney's trust account). And Feldman's offense conduct falls within the application note's description of sophisticated money laundering involving "two or more levels (i.e., layering) of transactions." U.S.S.G. § 2S1.1 cmt. n.5(A)(iii).
4. We Need Not Consider the Substantive Reasonableness of Feldman's Sentence.
Feldman argues that his above-guideline sentence is substantively unreasonable, but we disagree. The district court considered the statutory sentencing factors, see 18 U.S.C. § 3553(a), and concluded that "a very significant sentence is appropriate in light of the scope of this conspiracy [and] the significant harm that this crime caused to [the] community and the customers and [the] tourist industry." The district court drew attention to Feldman's perjury, stating that "we have to have a system of justice that imposes serious consequences to people who do that." And the district court found that Feldman "ha[d]n't shown any remorse."
The factual findings supporting the reasoning of the district court are not clearly erroneous. As we have already explained, the district court did not clearly err when it found that Feldman had perjured himself. Nor did it clearly err when it found that Feldman was not remorseful. True, at the first sentencing hearing, Feldman stated that he "t[ook] full responsibility" for his "bad judgment to get in this business," and his attorney stated at the second sentencing hearing that Feldman "fe[lt] ashamed of himself." But Feldman always insisted that he "never intended ... to cheat or to defraud anybody." The district court reasonably interpreted these equivocal expressions of shame to mean that Feldman refused to admit that "[he] kn[e]w [he] did something wrong." Feldman argues that he "did as much as he could to express remorse without effectively waiving his right to pursue substantial appellate claims," but this suggestion is unpersuasive. Feldman could have expressed that he felt bad about what happened to the nightclubs' customers-who, at a minimum, were lured to the nightclubs by deception and led to spend outrageous sums of money on alcohol the price of which they were discouraged from ascertaining until it was too late-even while arguing that what befell them did not satisfy the statutory definition of fraud, that he did not know about it, or both. He never did so. The district court did not clearly err in finding that Feldman failed to exhibit remorse.
Findings that a defendant lacks remorse and committed perjury to escape conviction are a valid basis for an upward variance. See United States v. Mateos , 623 F.3d 1350, 1367 (11th Cir. 2010) (affirming 360-month sentence, an upward variance from the guideline range of 216 to 262 months, based in part on the "significant" factors that the defendant lacked remorse and that she committed perjury). Feldman argues that a district court must find "extraordinary circumstances" before varying upward based on perjury from a guideline range that already incorporates an obstruction-of-justice enhancement, but no such requirement exists. See id. at 1368-69 (affirming upward *1265 variance based in part on perjury even though the obstruction-of-justice enhancement was applied). On the contrary, a defendant's perjury at trial speaks directly to important sentencing factors-including the "characteristics of the defendant," "respect for the law," and the ability of the criminal-justice system "to afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(1), (a)(2)(A)-(B) -"and it is within [the district] court's discretion to decide how much weight to give each of the § 3553 factors." Mateos , 623 F.3d at 1369. "Giving that decision the deference it is due, we cannot say that [Feldman's] sentence is outside the range of reasonable sentences, or that the district court committed a clear error of judgment in imposing it." Id.
IV. CONCLUSION
We AFFIRM Feldman's convictions and sentence.