[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 19-15024

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ANTARIOUS CALDWELL,
a.k.a. Fat,
a.k.a. Phat,
KEVIN CLAYTON,
ALONZO WALTON,
a.k.a. Spike,
VANCITO GUMBS,
DONALD GLASS,
a.k.a. Smurf,
a.k.a. Dred,

2                    Opinion of the Court                    19-15024

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:16-cr-00145-TWT-JKL-39

_____

Before WILLIAM PRYOR, Chief Judge, JILL PRYOR, Circuit Judge, and
COOGLER,[*] Chief District Judge.

WILLIAM PRYOR, Chief Judge:

This appeal arises from a multiple-count indictment against
dozens of members of the Gangster Disciples. Five of them,
Alonzo Walton, Kevin Clayton, Donald Glass, Antarious Caldwell,
and Vancito Gumbs, appeal their convictions and sentences follow-
ing a joint trial. Some argue that the district court should have sup-
pressed wiretap evidence against them. Some argue that their en-
hanced sentences under the Racketeer Influenced and Corrupt Or-
ganizations Act violate the Sixth Amendment because the jury
failed to find that the conspiracy involved murder. Several argue
that the district court abused its discretion when it refused to play
a video about unconscious bias, excluded a professor of social
work's expert opinion testimony, secured the defendants with

_____

[*] Honorable L. Scott Coogler, Chief United States District Judge for the North-
ern District of Alabama, sitting by designation.

ankle restraints at trial, allowed the prosecution to store evidentiary firearms in the courtroom, and questioned a witness. And they also bring individual procedural and sentencing challenges. We vacate one of Caldwell's convictions and his sentence due to an intervening precedent, but we otherwise affirm the convictions and sentences.

## I. BACKGROUND

We divide our review of the background into three parts. First, we explain the Gangster Disciples gang and the defendants' roles within it. Second, we describe the crimes relevant to this appeal. Third, we recount the relevant parts of the pretrial proceedings, trial, and sentencing.

### A. *The Gangster Disciples*

The Gangster Disciples began as a loosely affiliated network of street gangs in Chicago but later became a hierarchical national organization. At the times relevant to this appeal, that hierarchy consisted of a "Chairman" and "national board" for the country, "Governors of Governors" in charge of multi-state regions, "Governors" in charge of each state, "Regents" in charge of counties, and "Coordinators" in charge of municipal-level divisions or, in larger cities, subdivisions called "counts" or "decks." Other leaders had specific portfolios within the gang. For example, the "Chief Enforcer" managed a team of "Enforcers" who exacted punishments for violations of the gang's rules, such as the prohibition against cooperating with the police.

The investigation that led to this trial and appeal focused on the activities of a group called the "Hate Committee." The committee served as an "enforcement" team for the gang in Georgia. Donald "Smurf" Glass led the Hate Committee.

The defendants held a variety of posts within the Georgia Gangster Disciples. Alonzo "Spike" Walton was Governor. In that role, he approved all "greenlights" of violent acts by subordinates. He "stamped"—that is, approved the formation of—the Hate Committee and integrated it in his chain of command. Kevin "K.K." Clayton was Chief Enforcer, responsible for countering internal threats. In 2013, he earned the dubious distinction of "Enforcer of the Year." Clayton had the authority to issue a "greenlight" to punish a Disciple for a violation of the gang's rules. Donald "Smurf" Glass was the leader of the Hate Committee and, in Clayton's words, his "right hand guy." In that role, he maintained a close relationship with committee members. For example, one member, Quantavious Hurt, lived in his home. Antarious "Fat" Caldwell was a committee member. Finally, Vancito Gumbs, a police officer, was a Disciple who worked directly with Clayton. Quantavious Hurt identified Gumbs as a Disciple, and another police officer said that Gumbs confessed to being a member and had Disciple tattoos. A month after the crimes we recount below, Gumbs expressed remorse for being a "gd hitman" in a text to his girlfriend.

In November 2013, the Federal Bureau of Investigation secured judicial authority to wiretap Walton's phone. In the required

affidavit explaining the necessity for the wiretap, Agent William K. Murdock explained that no human source had been able to infiltrate the gang and secure the trust of key members, though three confidential human sources and four cooperating defendants had provided some helpful information. In January 2014, the Bureau requested a 30-day extension of the wiretap. Agent Murdock provided a similar affidavit, explaining that alternatives to wiretapping were not viable and that "no viable confidential human sources have been identified that are able to infiltrate the gang." He did not discuss the specific human sources he had mentioned in the first affidavit. The district judge approved the extension.

### B. Relevant Crimes

The indictment charged an array of criminal activities. We narrate those relevant to this appeal. And we review them in chronological order.

### 1. Carjacking of Mildred Frederick

Alonzo Walton volunteered to help his friend Mildred Frederick after she damaged her car by failing to put oil in it. His "help" was insurance fraud: Walton destroyed the car, and Frederick reported it stolen.

Frederick started dating Walton's friend Laderris Dickerson. But in March 2014, after Frederick and Dickerson started having troubles with their relationship, Dickerson and Walton decided to rob Frederick of the proceeds from the insurance fraud and other savings.

Later that month, Walton and Dickerson lured Frederick to a parking lot with the promise that someone would meet her there to sell her a car for a good price. The co-conspirators arranged for another Disciple whom Dickerson did not know to arrive at the scene and demand Frederick's cash and rental car at gunpoint. Walton assured Dickerson that he would use his authority as Governor to ensure that Frederick would not be harmed.

The plan succeeded. Frederick and Dickerson drove to the site, and the robber demanded Frederick's money at gunpoint. When Frederick said she had only five dollars, Dickerson revealed that $14,000 was in the glove compartment. Frederick then attacked the robber and wrestled with him for a few seconds before he took control of her car, kicked her out of it while it was moving, and sped away. Walton, Dickerson, and the robber split the proceeds. Dickerson and Frederick surmised that the robber had been instructed not to use the gun because he had allowed Frederick to resist without shooting her.

### 2. Attempted Robbery of Eric Wilder

On June 27, 2015, Caldwell and another Hate Committee member invaded Eric Wilder's home to rob him of drugs and money. The robbers knocked on Wilder's door and pointed a gun at him when he cracked it open. Wilder slammed the door shut. Caldwell fired through the door and hit Wilder in the chest. The robbers then forced their way into the apartment, stole a small amount of marijuana, and fled.

### 3. Murder of DeMarco Franklin

Hate Committee member Quantavious Hurt murdered De-Marco Franklin on July 1, 2015. Hurt sparked a dispute with members of the Bloods gang when he leaned on one of their cars at a gas station. After members of the rival gang opened fire, Hurt fled to a friend's house. Hurt later went to Glass's home to inform him of the situation.

Glass said that the committee needed to "do something about the situation"—per Hurt's later trial testimony—because Hurt's flight made the committee look bad. Glass apparently preferred that Hurt's colleague "handle" the situation—Hurt took this to mean "shoot somebody." But Hurt also understood Glass to allow Hurt to "handle" the situation if he wanted to. Glass gave Hurt a symbolic black flag, to remove any fingerprints from the gun he would use and to cover his face.

Hurt returned to the gas station and found DeMarco Franklin, whom he believed was involved in the first incident. Hurt followed Franklin and murdered him in front of his girlfriend and her four-year-old child. When Hurt reported back, Glass was "in shock" that Hurt had personally settled the score, but also said that Hurt "did what [he was] supposed to do." Hurt later learned that Franklin had nothing to do with the earlier incident.

### 4. Stone Mountain Inn and Central Avenue Shootings

The spree of violence continued two days later on July 3. Glass planned a robbery of the Stone Mountain Inn, where a drug dealer named "Zay" based his operations. Zay was a member of

the Stone Mountain "deck" of the Gangster Disciples who came from North Carolina. These Disciples were not "plugged in"—that is, not "stamped official" or initiated "full member[s]" of the gang. The Hate Committee aborted its initial attempt to rob the drug dealer at the Inn because police officers were there. Some Hate Committee members returned in the evening to "chill" with the Stone Mountain Gangster Disciples. A dispute broke out over the status of the out-of-town Disciples as "plugged in." Acting on a standing order from Glass against Disciples who were not plugged in, the Hate Committee attacked the Stone Mountain Disciples and killed Edward Chadmon. A member of the Hate Committee, Rodricious Gresham, was wounded in the firefight.

The Hate Committee held a meeting to discuss the injury of one of its own. At the meeting, the ranking Disciple decided that the Stone Mountain deck was to blame for the incident. That deck would be "put on hold," or excommunicated, and the Hate Committee was given an "S.O.S.," or "smash on [sight]," order to "[k]ill, beat, [and] assault" any members of the deck. Glass provided weapons and ammunition for the attack and passed along the directive to "apply pressure" by killing and assaulting people.

Members of the Hate Committee opened fire on a crowd on Central Avenue in the Stone Mountain area and injured a bystander. When the members returned to Glass's home afterward, he appeared to approve of their actions and encouraged them to "continue" with the same activity. The committee members went back to Central Avenue, murdered Rocqwell Nelson, and injured a

woman standing with Nelson on her patio. When they returned to Glass, he again praised their actions and encouraged them to continue. Again the group went out, greeted "White Boy"—a member of the "on hold" Stone Mountain deck—, then shot him in the stomach at point-blank range. Again, Glass was "pleased" with the result.

### 5. Murder of Robert Dixon

The last crime relevant to this appeal was Glass's killing of Robert "Rampage" Dixon in August 2015. Dixon was accused of stealing from another Disciple in violation of gang rules. According to Gresham, a Hate Committee member and prosecution witness, Glass gave a "greenlight" to punish Dixon for this violation. Glass recruited other Disciples to "go holler" at Rampage. He brought Dixon outside the apartment where Dixon was staying to "talk," but after a few minutes of talking, according to a witness, Glass pulled out his gun and shot Dixon in the head, killing him.

### C. Pretrial and Trial Proceedings

The principal charge against all the defendants was count one, which charged that the defendants conspired to "conduct and participate directly and indirectly in the conduct of [the Gangster Disciples] through a pattern of racketeering activity" in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c). The indictment also charged the defendants with the enhanced sentencing provision of the Act, *see id.* § 1963(a), for joining and remaining in the conspiracy "knowing and agreeing that members of the enterprise engaged in acts involving murder,

in violation of Official Code of Georgia 16-5-1." The indictment named 34 defendants, and this appeal concerns the joint trial of Alonzo Walton, Kevin Clayton, Donald Glass, Antarious Caldwell, and Vancito Gumbs, who were convicted, and Perry Green, who was acquitted.

Before trial, Gumbs moved the district court to show prospective jurors a video on unconscious bias prepared by the district court for the Western District of Washington. *See Unconscious Bias Juror Video*, United States District Court for the Western District of Washington, https://www.wawd.uscourts.gov/jury/unconscious-bias. He also proposed a list of voir dire questions about their possible unconscious biases and requested that the prospective jurors be given accompanying jury instructions. The instructions told the jurors that they "must not be influenced by" their unconscious biases—the same biases the instructional video asserted were "automatic" and inevitable.

The district court denied the motion. It described "a lot of this discussion" about unconscious bias as "politically correct nonsense . . . not based on any valid scientific or empirical study." It doubted that the Western District of Washington could know that the jurors in Georgia were unconsciously biased and worried about telling the jurors at the outset that they were biased. The district court expressed concern that the video would "cause jurors to question their ability to make judgments based upon their common sense"; would "suggest that jurors of one race . . . should think that the opinions of a juror of another race are based on bias

and prejudice" to the detriment of collective deliberation; and would be ineffective in ameliorating the cultural differences between the prospective jurors and the defendants.

The district court later denied Gumbs's motion, filed six business days before trial, to admit Dr. Roberto Aspholm as an expert witness. Aspholm, a professor of social work, researched and taught about the Gangster Disciples. Gumbs said that Aspholm's testimony would illuminate the structure of the Gangster Disciples, on which the prosecution's theory of a unified criminal organization depended. He did not explain the basis of Aspholm's proposed testimony except that it would be "based on his years of firsthand (particularly university/academic-based) investigations." The district court denied Gumbs's motion as untimely and because the explanation of the proffered testimony was inadequate. *See* FED. R. CRIM. P. 16(b)(1)(C) (2018). When the prosecution introduced non-expert testimony about the structure of the Gangster Disciples, Gumbs moved again to be allowed to call Aspholm to rebut that testimony, but the district court denied the request.

The district court ordered that all the defendants be secured with ankle restraints throughout the trial. Over the defendants' objections, the district court accepted the marshal's request to restrain the defendants "because of the number of the defendants and the difficulty of preventing an incident if they collectively decided that something was going to happen." The district court ordered that the chains be muffled, that no restraints be visible, and that the defendants enter the courtroom before the jurors and remain seated

so that the jury would never see the chains. And at the outset of trial, the district court requested that a defendant stand up to test whether the restraints would be audible when the defendants rose and sat. The defendants were each seated next to their counsel, so they could consult with them despite the restraints.

The district court allowed the prosecution to bring firearms as evidence. The prosecution was permitted to bring the firearms into the courtroom and store them in boxes next to the counsel table for the duration of the day in which they would be used. The district court denied Gumbs's request to keep the boxes outside the jury's sight.

The district court denied a motion to suppress the fruits of the extension of the wiretap of Walton's phone. Clayton argued that the extension was unlawful because the underlying supporting affidavit was incomplete and the application did not provide the court with statutorily mandated information. *See* 18 U.S.C. § 2518(1)(c). The district court denied the motion to suppress on the ground that the application was adequate despite any omission. It concluded, in the alternative, that suppression was not justified because there was no allegation that the affidavit was intentionally deceptive or reckless with respect to the truth or that the failure to discuss the human sources was material to the statutory criteria for a wiretap. *See Franks v. Delaware*, 438 U.S. 154, 171–72 (1978). The district court also ruled that the good-faith exception to the exclusionary rule foreclosed suppression of the fruits of the wiretap. *See United States v. Leon*, 468 U.S. 897, 922–24 (1984).

At the end of the prosecution's case-in-chief, the district court asked Agent Murdock whether DeKalb County, in which the events to which he had testified took place, was within the Northern District of Georgia. Murdock said yes; no one objected; and the government rested.

The verdict form proposed by the district court asked whether each defendant was guilty of "Count One of the indictment charging RICO conspiracy" and whether "the RICO conspiracy involve[d] murder." The second question corresponded to the notice of enhanced sentencing in the indictment, which depended on a finding that "members of the enterprise engaged in acts involving murder, in violation of Official Code of Georgia 16-5-1." *See* GA. CODE § 16-5-1 (defining malice and felony murder and setting the maximum penalty at death); 18 U.S.C. § 1963(a).

Walton, in an objection all the defendants joined, argued that the district court should specify that "to find the Enhanced sentence for murder," the jury must find beyond a reasonable doubt that "the Defendants joined and remained in the RICO conspiracy charged in Count One knowing and agreeing that members of the enterprise engaged in acts involving murder." Gumbs contended that his verdict form should ask whether he was guilty of "conspiracy to commit murder." The district court overruled the objections. The final verdict form for each defendant included an interrogatory that asked whether "the RICO conspiracy involve[d] murder."

The relationship between the two questions for count one was muddled in the jury instructions. For count one, the jury had to find a "pattern of racketeering activity" to convict, which meant that it had to find that at least two racketeering acts were committed by members of the criminal enterprise. *See* 18 U.S.C. §§ 1962(c), 1961(5). The indictment alleged ten types of racketeering acts. In its instructions, the district court labeled three of these categories of racketeering acts—Georgia-law actual murder, attempted murder, and conspiracy to commit murder—as "acts involving murder." The district court defined "murder" to mean only actual murder, not any inchoate version of that offense. The enhanced sentencing provisions applied to the defendants only if a racketeering act on which the conviction was based was *actual* "murder" because the enhanced sentencing provisions require a racketeering act punishable by life imprisonment. *See id.* § 1963(a); GA. CODE §§ 16-5-1(e)(1), 16-4-6, 16-4-8. In closing arguments, the prosecution elided this distinction and argued that the special interrogatory in the verdict form asked whether the Gangster Disciples "engaged in acts involving murder, which includes murder and attempted murder."

The jury returned mixed verdicts. Walton was convicted of the racketeering conspiracy, carjacking Frederick, and using a firearm during that carjacking. *See* 18 U.S.C. § 2119; *id.* § 924(c)(3)(A). Clayton was convicted of the racketeering conspiracy only. Glass was convicted of the racketeering conspiracy, acquitted of the murder of Robert Dixon, convicted of carrying a firearm during a crime of violence, namely the killing of Robert Dixon, *id.* § 924(c)(3)(A), convicted of causing the death of Robert Dixon

with a firearm, *see id.* § 1111, and acquitted of two marijuana possession charges. Caldwell was convicted of the racketeering conspiracy, the attempted Hobbs Act robbery of Eric Wilder, *see id.* § 1951, and carrying a firearm during a crime of violence, the attempted robbery, *see id.* § 924(c)(3)(A). Vancito Gumbs was convicted of the racketeering conspiracy. For each of the convicted defendants, the jury found that "the RICO conspiracy involve[d] murder." The jury acquitted a sixth codefendant, Perry Green.

At sentencing, the defendants objected to the recommendation in the presentence investigation report that they receive enhanced sentences under the Racketeer Influenced and Corrupt Organizations Act. The Act provides for a maximum sentence of life imprisonment instead of only 20 years if "the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment." *Id.* § 1963(a). The defendants argued that the verdict form question whether "the RICO conspiracy involve[d] murder" asked the jury whether the conspiracy involved either actual murder or inchoate versions of that offense. Because the jury verdict did not distinguish between actual murder, which can support a life sentence under Georgia law, and inchoate forms of murder, which cannot, they argued that their sentences could not exceed 20 years. *See id.* They styled this objection as an argument that a sentence based on the finding of actual Georgia-law murder would violate the Sixth Amendment. *See Apprendi v. New Jersey*, 530 U.S. 466, 476 (2000).

The district court disagreed. It reasoned that the verdict form said "murder" without mentioning the inchoate forms, so the district court was "convinced beyond any doubt that . . . the jury meant . . . malice murder." It sentenced the defendants under the enhanced sentencing provisions.

The district court imposed lengthy sentences of imprisonment. Walton received 384 months of imprisonment. Clayton received 396 months of imprisonment. Glass received a sentence of life imprisonment plus 120 months. Caldwell received 360 months of imprisonment. And Gumbs received 180 months of imprisonment.

## II. STANDARDS OF REVIEW

Several standards of review govern this appeal. We review the conduct of voir dire, the refusal to admit expert opinion testimony, the decision to shackle the defendants, the regulation of the use of firearms as courtroom evidence, and the judge's decision to question a witness for abuse of discretion. *United States v. Hill*, 643 F.3d 807, 836 (11th Cir. 2011) (conduct of voir dire); *St. Louis Condo. Ass'n, Inc. v. Rockhill Ins. Co.*, 5 F.4th 1235, 1242 (11th Cir. 2021) (expert testimony and evidentiary rulings); *United States v. Baker*, 432 F.3d 1189, 1245 (11th Cir. 2005) (shackling determination), *abrogated on other grounds by Davis v. Washington*, 547 U.S. 813, 821 (2006); *United States v. Day*, 405 F.3d 1293, 1297 (11th Cir. 2005) (judge's engagement with witness testimony).

When reviewing the denial of a motion to suppress wiretapped communications, we review legal conclusions *de novo* and

factual findings for clear error. *United States v. Goldstein*, 989 F.3d 1178, 1192–93 (11th Cir. 2021). Preserved *Apprendi* challenges are reviewed *de novo*. *United States v. Candelario*, 240 F.3d 1300, 1306 (11th Cir. 2001). We review the legal correctness of jury instructions *de novo*, but the district court has "wide discretion as to the style and wording employed." *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1285 (11th Cir. 2014) (citation omitted). And "[w]e reverse only where we are left with a substantial and ineradicable doubt as to whether the district court properly guided the jury." *Id.* (citation and internal quotation marks omitted). Sufficiency of the evidence is reviewed *de novo*, and we ask whether "no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Morel*, 63 F.4th 913, 917 (11th Cir. 2023) (citation omitted).

We "review the reasonableness of a sentence for abuse of discretion using a two-step process." *United States v. Feldman*, 931 F.3d 1245, 1254 (11th Cir. 2019) (citation omitted). First, we determine whether there was a "significant procedural error," including failing to consider the statutory factors, ignoring or miscalculating the guideline range, or "failing to adequately explain the chosen sentence." *Id.* (citation omitted). Second, we evaluate the substantive reasonableness of the sentence. *Id.* At that stage, the defendant "has the burden of showing that the sentence is unreasonable in light of the entire record, the [section] 3553(a) factors, and the substantial deference afforded sentencing courts." *United States v. Fox*, 926 F.3d 1275, 1282 (11th Cir. 2019) (citation and internal quotation marks omitted). The interpretation of statutory terms like "crime

of violence" is reviewed *de novo*. *United States v. Johnson*, 399 F.3d 1297, 1298 (11th Cir. 2005).

Issues that are not properly preserved by timely objection are reviewed for plain error. *Puckett v. United States*, 556 U.S. 129, 134–35 (2009). We can correct such errors if they are plain, if they affect a substantial right, and "if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Laines*, 69 F.4th 1221, 1229 (11th Cir. 2023) (citation omitted).

## III. DISCUSSION

We divide our discussion into 13 parts. In the first five parts, we explain why the district court did not abuse its discretion in its pretrial and trial procedural decisions. In the next two parts, we address the defendants' arguments that their convictions must be overturned because the wiretap evidence should have been suppressed and because the defendants should not have been subject to enhanced sentencing provisions. We then turn to five individual challenges to convictions and sentences. And finally, we briefly explain that Caldwell's sentence must be vacated because of *United States v. Taylor*, 142 S. Ct. 2015 (2022).

### A. The District Court Did Not Abuse Its Discretion When It Declined to Play a Video about Unconscious Bias.

The defendants argue that the district court should have required the jury venire during voir dire to watch a video about unconscious bias to mitigate potential racial bias against them and that the district court should have given corresponding jury

instructions. Although the district court sometimes has an obligation to permit defendants "to ask questions about racial bias during *voir dire*," *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 868 (2017); *see also Ham v. South Carolina*, 409 U.S. 524, 526–27 (1973), it retains "broad discretion to manage *voir dire*," *United States v. Tsarnaev*, 142 S. Ct. 1024, 1036 (2022). We have never held that a district court must conduct unconscious bias training or allow unconscious bias questioning during voir dire.

The district court did not abuse its discretion. Jurors are entitled—indeed, expected—to make inferences based on common sense. *See, e.g.*, *United States v. Marino*, 562 F.2d 941, 944–45 (5th Cir. 1977); Pattern Crim. Jury Instr. 11th Cir. BI B4 (2020) ("In considering the evidence you may use reasoning and common sense to make deductions and reach conclusions."). The proffered video, in contrast, labels *all* deeply ingrained judgments based on experience, even those not based on racial, religious, or other protected characteristics, as "biases." And it encourages jurors to second-guess their conclusions and to engage in counterfactual thought experiments flipping the age, race, or gender of various trial participants. The district court reasonably determined that the video could "cause jurors to question their ability to make judgments based upon their common sense and experience." The video encourages jurors to doubt their own conclusions and the conclusions of their peers, and to presume that any decision is tainted by an "automatic" and unavoidable bias. It was also not an abuse of discretion to conclude that it would be harmful to jury deliberations to suggest to the jurors that they should be suspicious of their

prospective colleagues' decisions based on the possibility of unconscious racial bias. And, insofar as racial biases stemming from cultural differences could have tainted the trial, the district court reasonably doubted "that a ten-minute video from the district court in Washington is going to ameliorate in any way th[ose] cultural differences." *See United States v. Mercado-Gracia*, 989 F.3d 829, 839–41 (10th Cir. 2021) (upholding a rejection of the same video).

The district court also did not abuse its discretion when it declined to ask questions during voir dire about unconscious bias. The choice of procedure to identify and respond to bias on the part of potential jurors is left to the "sound discretion" of the district court. *Hill*, 643 F.3d at 836 (citation omitted). The district court highlighted serious concerns with juror education materials and instructions that simultaneously tell each potential juror that he has inevitable unconscious biases *and* that he has a legal duty not to let these unconscious biases influence him. Gumbs does not dispute that the district court allowed some questions that explicitly touched on potential racial bias by jurors; it barred only the unconscious-bias line of questioning.

*B. The District Court Did Not Abuse Its Discretion When It Declined to Admit Dr. Aspholm's Expert Testimony.*

The defendants next argue that the district court abused its discretion when it declined to admit the expert opinion testimony of Dr. Roberto Aspholm about the nature and structure of the Gangster Disciples. The district court found that Gumbs's disclosure was untimely and inadequate. The defendants contend that

Gumbs's disclosure was timely because it gave the prosecution several weeks of notice before Aspholm would testify even though it had only six business days before trial began. And they contend that even if Gumbs's initial disclosure was untimely, Aspholm should have been allowed to testify to rebut the prosecution's portrayal of the gang. The defendants argue that the disclosure was specific enough to provide the prosecution fair notice of the content of Aspholm's testimony. *See* FED. R. CRIM. P. 16(b)(1)(C) (2018). The district court's decision was not "manifestly erroneous," *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc) (citation omitted), with respect to any ground, so we affirm.

It was not an abuse of discretion to find that Gumbs did not provide timely notice of the testimony. Gumbs filed his notice only six business days before trial began. The district court determined that six business days before a complicated multidefendant trial was insufficient time for the prosecution to prepare a rebuttal of Aspholm's testimony or to secure a comparable expert witness to respond to his testimony. And it reasonably concluded that it was unfair to ask the government to formulate its response after the trial had started.

Although not in effect when the trial occurred in 2019, the revised Rules explicitly adopt this commonsense proposition. The current version of Rule 16, effective as of December 1, 2022, requires that notice of expert opinion testimony come "sufficiently before *trial*" for adequate preparation and does not measure timeliness based on the expected date of the testimony. FED. R. CRIM. P

16(b)(1)(C)(ii) (2022) (emphasis added). We are loath to condemn as an abuse of discretion a decision of the district court that accords with the rule that would apply today, particularly where the earlier rule was silent on the issue.

The defendants' defense for Gumbs's late disclosure—that he did not realize until shortly before trial that the prosecution would portray the Gangster Disciples as a hierarchical criminal conspiracy—is frivolous. The second paragraph of the indictment alleges that the Gangster Disciples "employ a highly structured organization" to commit their crimes. That portrayal was never in doubt. For the same reason, the district court did not abuse its discretion when it declined to reconsider admitting Aspholm after the prosecution presentation of the structure of the Gangster Disciples.

The district court also did not abuse its discretion when it ruled that Gumbs failed to provide an adequate description of Aspholm's testimony and "the bases and reasons for those opinions." FED. R. CRIM. P. 16(b)(1)(C) (2018). Gumbs never informed the prosecution of the sources on which Aspholm would base his testimony. The best explanation of Aspholm's testimony came in Gumbs's reply to the government's opposition to his admission. That document states Aspholm's *conclusions* that "the Gangster Disciples is not and has not been the unitary, tightly organized, structured, coordinated, and controlled organization that the Government characterizes it as" and that the organization "sometimes serves political, philosophical, cultural, and even quasi-religious

functions" instead of criminal ones. The district court did not abuse its discretion when it found vague references to "interviewing and field work . . . and statistical analysis" and "research, analysis, and teaching," on gangs in general to be an inadequate explanation of the basis for Aspholm's opinions.

### C. The Ankle Restraints Did Not Violate the Defendants' Rights.

Gumbs, Glass, and Caldwell argue that the district court abused its discretion when it ordered them to be restrained at the ankles throughout trial. They argue that the district court failed to conduct an individualized inquiry into their dangerousness and to give notice of the grounds for its decision. This argument fails.

Our legal tradition strongly disfavors visibly restraining criminal defendants. As the Supreme Court explained, "Blackstone wrote that 'it is laid down in our antient books, that, though under an indictment of the highest nature,' a defendant 'must be brought to the bar without irons, or any manner of shackles or bonds; unless there be evident danger of an escape.'" *Deck v. Missouri*, 544 U.S. 622, 626 (2005) (quoting 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *322). "[T]he use of physical restraints visible to the jury" is prohibited "absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Deck*, 544 U.S. at 629. This rule exists to prevent prejudice to the presumption of innocence, the right to counsel, and the dignity of criminal proceedings. *Id.* at 630–31.

The common-law rule against shackling prevents creating an unfair impression of guilt for the jury and is limited to contexts that implicate that danger. We have held the rule does not apply to proceedings in which the jury is not present, such as sentencing. *United States v. LaFond*, 783 F.3d 1216, 1225 (11th Cir. 2015). In rejecting a petition for a writ of habeas corpus, we have explained that Supreme Court precedents about shackling "are not applicable to security devices or measures that are not visible." *Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1305 (11th Cir. 2019). And we have *never* reversed a conviction based on the use of restraints *invisible* to the jury. *See, e.g.*, *Baker*, 432 F.3d at 1246; *United States v. Mayes*, 158 F.3d 1215, 1226–27 (11th Cir. 1998); *United States v. Battle*, 173 F.3d 1343, 1346–47 (11th Cir. 1999).

We reject the defendants' challenge because the record makes clear that the ankle restraints were not perceptible to the jury and no defendant alleges that he lacked access to counsel. The district court ordered that the restraints be placed on the defendants' legs only, that they be muffled to prevent clanking, that a curtain around the defense table conceal them from the jury, and that the defendants enter and exit the courtroom outside the presence of the jury. The defendants unpersuasively complain that the district court could have done *more* to investigate the possibility of prejudice. They also make the unsubstantiated assertion that the ankle restraints "very probably caused fear of the defendants." The district court took steps to verify that the restraints were imperceptible, so we do not credit the defendants' speculation about the jurors' perceptions.

*D. The District Court Did Not Abuse Its Discretion in Regulating the Use of Firearms as Evidence.*

Gumbs, Glass, and Caldwell argue that the prosecutors' use of firearms as physical evidence at trial violated their right to due process by undermining the presumption of innocence. They contend that the district court should have granted Gumbs's motion to "prohibit the storing of weapons in the courtroom, in boxes, from which boxes various of those weapons regularly were extracted, paraded around the court room, and handed to the jurors to pass amongst themselves." They argue that there was "no real reason" for this procedure except to paint the defendants as "dangerous renegade[s]." We disagree.

The district court followed a reasonable procedure for handling the weapons. The prosecution showed the weapons as evidence to prove the charged crimes that involved firearms at trial. The defendants fail to substantiate their accusation that the weapons were stored in this manner solely to prejudice them. And they fail to mention any specific instances where the prosecution used the guns in an inappropriate way. The district court reasonably balanced the inconvenience of storing the weapons in a separate room against the prejudice of piling up weapons in the courtroom and struck a sensible balance in which the guns were kept out of view in boxes and the boxes were limited to those needed that day. The district court did not abuse its discretion.

*E. The District Court Did Not Impermissibly Depart from Neutrality When It Questioned a Witness.*

Caldwell, Gumbs, and Walton contend that the district court committed plain error and deprived them of a fair trial when it asked a prosecution witness whether DeKalb County—the location of some of the criminal activity he described—is in the Northern District of Georgia. That DeKalb County is within the Northern District of Georgia established venue, *see United States v. Snipes*, 611 F.3d 855, 865–66 (11th Cir. 2010), so the defendants contend that the question unfairly helped the prosecution. We disagree.

The trial judge is "more than a referee to an adversarial proceeding." *United States v. Harris*, 720 F.2d 1259, 1261 (11th Cir. 1983). Consistent with the common-law tradition, the judge may "comment on the evidence" and "question witnesses and elicit facts not yet adduced or clarify those previously presented." *Moore v. United States*, 598 F.2d 439, 442 (5th Cir. 1979). This questioning is limited only by the principle that a judge must maintain neutrality between the parties. *See id.* (approving a trial judge's decision to ask 105 questions of the defendant).

The district judge stayed well within these bounds. He asked a single question without commenting on the veracity or relevance of the witness's testimony. The legal status of DeKalb County is a "legislative fact" not particular to the parties, so the district court was entitled to instruct the jury that the county was within the Northern District of Georgia. *See* FED. R. EVID. 201, advisory committee notes to 1972 proposed rules; *United States v. Bowers*, 660 F.2d

527, 530–31 (5th Cir. Unit B 1981). The district court did not err, let alone clearly err, when it asked a witness for that information.

*F. The District Court Correctly Declined to Suppress the Fruits of the Extended Wiretap.*

Clayton and Walton argue that the district court should have suppressed the fruits of the January 2014 extension of the wiretap on Walton's phone. They argue that Murdock failed to provide the required "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous," 18 U.S.C. § 2518(1)(c), because his extension application did not discuss the seven human sources mentioned in the initial application. They also argue that *Franks v. Delaware* does not limit the suppression of the fruits of wiretaps and that the good-faith exception to the suppression remedy also does not apply to wiretap cases. Because the district court properly applied *Franks* and the good-faith exception to the motion to suppress, we do not reach the argument that its ruling on section 2518(1)(c) was erroneous.

*Franks* addressed the suppression of evidence obtained pursuant to a warrant obtained through an affidavit containing false information. *Franks*, 438 U.S. at 155; *see* U.S. CONST. amend. IV ("[N]o Warrants shall issue, but upon probable cause . . . ."). The Court held that a factual error requires suppression of the evidence the warrant produced only if the defendant establishes "deliberate falsehood or . . . reckless disregard for the truth" by the affiant *and* "if, when material that is the subject of the . . . falsity or reckless

disregard is set to one side," probable cause would not support the warrant. *Franks*, 438 U.S. at 171–72; *see also id.* at 156. The defendants argue that *Franks* does not limit the statutory suppression remedy that applies to wiretaps obtained through a defective application. *See* 18 U.S.C. § 2518(10)(a)(i).

We have consistently applied *Franks* to motions to suppress the evidentiary fruits of wiretaps. *See United States v. Capers*, 708 F.3d 1286, 1296 n.6 (11th Cir. 2013) ("The rule in *Franks* has since been held applicable to affidavits submitted in support of court-ordered electronic surveillance."); *accord United States v. Malekzadeh*, 855 F.2d 1492, 1497 (11th Cir. 1988); *United States v. Novaton*, 271 F.3d 968, 984, 986 (11th Cir. 2001); *United States v. Votrobek*, 847 F.3d 1335, 1342 (11th Cir. 2017); *United States v. Perez*, 661 F.3d 568, 581 n.18 (11th Cir. 2011). Based on this binding precedent, we reject the defendants' challenge because they have failed to allege that Murdock asserted "deliberate falsehoods" or exhibited "reckless disregard for the truth." *Franks*, 438 U.S. at 171. And we affirm on the alternative ground that, as the defendants concede, our precedent also bars suppression of evidence obtained in good-faith reliance on a court-approved wiretap. *See Leon*, 468 U.S. at 922–24; *Malekzadeh*, 855 F.2d at 1496–97 (applying *Leon* to a motion to suppress the fruits of a wiretap). The defendants do not dispute the district court's determination that law enforcement acted in good faith.

## G. *The Sentences Do Not Violate* Apprendi.

Walton, Clayton, Glass, and Caldwell contend that their sentences are unconstitutional because they rest on enhanced

sentencing provisions of the Racketeer Influenced and Corrupt Organizations Act for which, they argue, the jury did not make the requisite findings. Gumbs joins this argument insofar as it bears on the district court's exercise of discretion in sentencing him. The defendants contend that the district court's alleged misreading of the jury's verdicts violates the Sixth Amendment requirement that "any fact other than a prior conviction that increases the penalty for a crime" must be found by a jury beyond a reasonable doubt. *Candelario*, 240 F.3d at 1303 (citations omitted and alterations adopted); *see Apprendi*, 530 U.S. at 476. We disagree.

This argument involves an unpreserved objection to the verdict form and jury instructions masquerading as an *Apprendi* challenge. *Apprendi* forbids a district court from making a factual finding necessary for an increased criminal penalty; only a jury may make that finding. *Apprendi*, 530 U.S. at 476. Here, the relevant factual finding was that the conspiracy involved actual murder, not attempted murder or conspiracy to commit murder. *See supra* Part I.C. The district court did not purport to find this fact when it applied the enhanced sentencing provisions. It instead determined that the jury's verdict form reflected that the *jury* had made that finding beyond a reasonable doubt. Clayton argues that because the verdict form was unclear—an objection we address below—the district judge had to "speculat[e]" about what the jury found and that *Apprendi* forbids that kind of speculation. But *Apprendi* does not address the district court's duty to interpret jury verdicts. It addresses a trial judge's inability to make factual findings that alter the penalty for a crime. *See, e.g., Candelario*, 240 F.3d at 1304. The

defendants argue that the district court *misread* the jury verdict and then applied the wrong statutory punishment based on that mistake. That argument does not implicate *Apprendi*.

The jury found that the conspiracy included actual, not inchoate, murder as part of its racketeering activities. Although the prosecutor in closing arguments elided the difference between the "acts involving murder" that could serve as predicate racketeering activities for *conviction* on count one and the actual "murder" required for the enhanced sentencing provision, the district judge did not make the same mistake. He instructed the jury that "acts involving murder" for the purposes of finding the two racketeering activities needed for conviction extended to Georgia-law conspiracy to commit murder and attempted murder. But the district court never said that the jury should read the phrase "involve murder" to mean "involve acts involving murder." The district court specifically defined "murder" to include only actual murder under Georgia law, which is "a racketeering activity for which the maximum penalty includes life imprisonment," 18 U.S.C. § 1963(a); *see* Ga. Code § 16-5-1(e)(1). And the verdict form asked whether the conspiracy "involve[d] *murder*," not "acts involving murder." The plain meaning of this phrase is that the question concerns what the district court defined as *murder*, not what the district court defined as *acts involving murder*. Any other reading would render the interrogatory purposeless; if it asked about "acts involving murder," it would not have any implications for the defendants' convictions or sentences. The district court correctly concluded that the jury

found that the conspiracy involved actual murder, as required for the enhanced sentencing provision.

As the government suggests, one could understand the defendants to argue that the jury verdict form was so *unclear* that the jury was confused about what it was being asked, but that challenge is unpreserved and meritless at this late stage. A challenge to jury instructions or the verdict form after the jury has delivered its verdict is too late. *United States v. Mitchell*, 146 F.3d 1338, 1342 (11th Cir. 1998). None of the defendants raised the ambiguity on which they now rely before jury deliberations. Walton, in an objection the other defendants joined, specifically argued that the verdict form ought to ask whether the conspiracy included "acts involving murder." We explain in the next section why the district court did not err when it rejected Gumbs's requested verdict form, but his objections to the proposed verdict forms did not rely on the difference between actual and inchoate murder. So the defendants never adequately brought the problem to the district court's attention, and our review is for plain error. *Id.*

"Meeting all four prongs [of the plain-error test] is difficult, as it should be," *Puckett*, 556 U.S. at 135 (citation and internal quotation marks omitted), and the defendants do not even attempt to establish that the district court plainly erred in a way that prejudiced them. The defendants offer no caselaw that establishes that it was "obvious or clear under current law," *Candelario*, 240 F.3d at 1309 (citation and internal quotation marks omitted), that the verdict form should have been phrased differently or that a specific

clarifying instruction was necessary. Nor have they established a "reasonable probability," *United States v. Shelton*, 400 F.3d 1325, 1331–32 (11th Cir. 2005), that the jury would have found that the conspiracy involved only attempted murder or a conspiracy to commit murder. And the record was replete with evidence of actual murders by members of the Gangster Disciples. Because of these deficiencies, we need not address the other elements of the plain-error test.

### H. Gumbs's Challenges to His Jury Verdict Form and Conviction Fail.

Gumbs contends that the district court should have used his preferred verdict form and that the failure to do so resulted in his being convicted on legally insufficient evidence. Glass agrees that the district court should have given Gumbs's proposed instructions. Gumbs's proposed verdict form asked whether he was guilty of "conspiracy to commit murder" and required the jury to name the intended victim of the murder if it answered affirmatively. Gumbs contends that there was no evidence from which the jury could have reasonably found that he was involved in the Gangster Disciples conspiracy before the murders alleged in the indictment took place. He argues that a properly instructed jury would not have found that he was part of a conspiracy in which actual murder was involved, so his sentencing guidelines calculation was erroneous. We disagree.

The district court acted within its "wide discretion" when it rejected Gumbs' proposed verdict form and jury instructions. *Bhogaita*, 765 F.3d at 1285. For the enhanced sentencing finding,

Gumbs wanted the district court to ask the jury whether Gumbs was guilty of "conspiracy to commit murder." That question could have easily misled the jury to believe that the *object* of the conspiracy had to be murder, when the relevant question was whether Gumbs was vicariously liable for a murder that was part of the pattern of racketeering activity that supported the conspiracy in which he was involved. *See* 18 U.S.C. §§ 1962(c), 1963(a). Moreover, Gumbs identifies no precedent supporting his request that the jury *name* the victim murdered. And as we have explained above, the district court gave accurate instructions and provided a verdict form for which no plain error has been established.

Gumbs has also not established that there was insufficient evidence that he was a member of a conspiracy that involved murder. He maintains that two key pieces of evidence tying him to the conspiracy—the wiretapped conversations between him and Walton and the text messages to his girlfriend in which he described himself as a "gd hitman"—took place *after* the murders alleged in the indictment. But this fact does not allow us to set aside the jury's verdict. Even on its own terms, Gumbs's argument does not make sense; a jury could fairly infer that if Gumbs expressed regret for being a hitman for the Gangster Disciples in August 2015, then he was already a Disciple only a month earlier during the July 2015 wave of violence. And other evidence presented at trial could support the finding that he was in the Gangster Disciples earlier than he argues. Quantavious Hurt testified that he knew Gumbs was part of the gang, and Gumbs joined the police force with what at

least one witness identified as preexisting Gangster Disciples tattoos.

### I. Clayton's Sentence Was Not Based on Clearly Erroneous Facts.

Clayton argues that we should vacate his sentence because it rested on clearly erroneous findings of fact. The district court explained that his 33-year prison sentence was "appropriate" because of the violent acts that the Gangster Disciples committed and because Clayton "was a high-ranking official" in the organization and had a role "of encouragement, recruitment, and applauding acts including murder that took place by others." Clayton argues that this description of his role was clearly erroneous because he did not personally recruit certain members of the Hate Committee nor encourage the Central Avenue murders in advance. But the district court committed no clear error.

Clayton's objection to the description of his role as "a high-ranking official" who was involved in recruiting criminals and encouraging murder is frivolous. Clayton admits that he was at one time "Chief Enforcer" for the Gangster Disciples—and indeed "*Enforcer of the Year*" in 2013. Ample testimony supported a finding that this role required violence, up to murder, to enforce gang discipline. Clayton also misses the mark when he argues that he did not initially recruit the individuals the prosecution mentioned at sentencing and did not know about the Central Avenue murders in advance. Wiretap evidence establishes that Clayton consistently held himself out as responsible for Hate Committee activities and for recruiting younger members of the Gangster Disciples to new roles

in the gang. Clayton called Glass, the leader of the Hate Committee, his "right hand guy." He referred to the younger members of the Hate Committee as "KK shooters," a reference to his nickname, and he boasted that he "brought the shooters to the . . . eastside." Likewise, Clayton's argument that the prosecution did not know exactly when he was Chief Enforcer is irrelevant to the findings underpinning his sentence; the district court did not rest its sentencing on a finding that Clayton was Chief Enforcer at a particular time.

*J. Sufficient Evidence Supported Glass's Racketeering Conviction.*

Glass challenges his conviction for the racketeering conspiracy on the ground that the jury acquitted him of the only predicate racketeering activities for which he was indicted. *See United States v. Browne*, 505 F.3d 1229, 1257 (11th Cir. 2007) (explaining that a racketeering conviction requires finding at least "two predicate racketeering acts"). He argues that because the jury acquitted him of the murder of Robert Dixon and for possessing drugs with intent to distribute them—the only crimes that were predicate "racketeering activities"—there must have been insufficient evidence for his conviction for the racketeering conspiracy. We disagree.

The jury was instructed that to convict on the racketeering conspiracy, it had to find two predicate acts on the list of several acts alleged in count one, which included many more crimes besides those specifically charged as traceable to Glass. We presume the jury followed this instruction. *See United States v. Kennard*, 472 F.3d 851, 858 (11th Cir. 2006). It could have relied on any two of

the acts described in count one. And settled precedent bars Glass's argument that there must not have been sufficient evidence for count one based on acquittal on the other counts. "[I]nconsistency between verdicts on different counts of the indictment does not vitiate convictions on those counts of which the defendant is found guilty." *United States v. Rosenthal*, 793 F.2d 1214, 1229 (11th Cir. 1986).

### K. Glass's Sentence Is Reasonable.

Glass challenges his prison sentence of life-plus-ten-years as procedurally and substantively unreasonable. He argues that his sentence was procedurally unreasonable because the district court miscalculated the guidelines range, based his sentence on clearly erroneous factual findings, and failed to consider the statutory factors for sentencing. He argues that his sentence is substantively unreasonable because the district court impermissibly weighed the statutory sentencing factors and sentenced him unfairly compared to his co-defendants. Each challenge fails.

### 1. Procedural Reasonableness

Glass reiterates, in the form of a guidelines challenge, the supposed *Apprendi* argument that we have already rejected. A sentence is procedurally unreasonable if the district court miscalculated the relevant guidelines range for a defendant. *Gall v. United States*, 552 U.S. 38, 51 (2007). Glass argues that the district court miscalculated his guideline range because it misread the verdict form to mean that the jury found the conspiracy involved actual, not inchoate, forms of murder. We reject this argument for the

reasons we explained in Part III.G. He also argues that the district court must have relied on the Dixon murder to calculate his base offense level as corresponding to that of murder, but he misunderstands the record: the district court based his offense level on his conviction on count one for a conspiracy that "involve[d] murder," regardless of the Dixon killing.

Aside from his guideline challenge, Glass argues that the district court sentenced him based on clearly erroneous factual findings. *See id.* (explaining that a sentence can be procedurally unreasonable if it is "select[ed] based on clearly erroneous facts"). Glass argues that the district court clearly erred when it said that he was the person in the case most responsible for "a trail of murder, mayhem, maiming and destruction of life" and found that he "physically murder[ed] Robert Dixon" and "directed [the Hate Committee's] teenage assassins to go out and simply randomly shoot, murder and maim people who were doing nothing other than just going about their lives."

None of these findings is clearly erroneous. Glass's only response to the findings is that he did not "corrupt[] an entire generation of teenagers" but rather "provided encouragement and support to local youth, including [Quantavious] Hurt." This assertion does not establish that the district court clearly erred. Ample evidence supported the finding that Glass led the Hate Committee that perpetrated the Central Avenue murders: multiple witnesses so identified him. Glass's assertion that he was a positive influence on local youth is belied by the uncontradicted evidence that he, for

example, encouraged the Hate Committee to *continue* the Central Avenue crimes after their first sortie and that he helped secure the weapons for the crimes. So it was not clearly erroneous to find that he was uniquely responsible for the violence and "directed" the Hate Committee to commit violent crimes.

Although Glass asserts that he was "disappointed" to learn that Hurt killed Demarco Franklin, Hurt testified that Glass told him that he did what he was "supposed to do." In any event, nothing contradicts Hurt's testimony that Glass ordered that *someone* engage in a reprisal killing after Hurt's dispute with the Bloods at the gas station. And notwithstanding Glass's acquittal of Dixon's murder under Georgia law, a district court is entitled to rely on acquitted conduct at sentencing if it finds that the conduct occurred based on a preponderance of the evidence. *United States v. Faust*, 456 F.3d 1342, 1347 (11th Cir. 2006). Multiple witnesses testified that Glass killed Dixon. Moreover, the jury found that Glass "cause[d] the death of Robert Dixon" in violation of federal law.

Glass's assertion that the district court failed to consider his individual characteristics is likewise meritless. *See* 18 U.S.C. § 3553(a)(1) (requiring that the district court consider "the history and characteristics of the defendant"). Glass complains that the district court did not "mention[ his] personal history and characteristics," such as his difficult childhood. But the district court need not discuss each factor under section 3553(a), *see United States v. Williams*, 526 F.3d 1312, 1322 (11th Cir. 2008). And the district court stated that it *did* consider Glass's history and characteristics,

presumably including the very facts he now cites, in selecting his sentence.

## 2. Substantive Reasonableness

Glass argues that his sentence is substantively unreasonable because it relied solely on one factor—protecting the public—in neglect of all other sentencing factors and because his sentence is much harsher than those of his codefendants. He also reiterates his argument that his sentence could not be based on the murder of Robert Dixon. We reject Glass's substantive challenge.

Our review is highly deferential. *United States v. Irey*, 612 F.3d 1160, 1191 (11th Cir. 2010) (en banc). A district court has discretion to assign relative weight to different sentencing factors, and the defendant has the "burden of showing that the sentence is unreasonable in light of the entire record, the [section] 3553(a) factors, and the substantial deference afforded sentencing courts." *Fox*, 926 F.3d at 1282 (citation omitted). Glass has not satisfied this heavy burden.

As we explained above, the district court did not clearly err when it found that Glass led the murderous Hate Committee and killed Robert Dixon. Glass received a harsher sentence than other leaders of the gang and other murderers, but he was the only defendant who combined leadership in the Gangster Disciples with personal commission of murder. It was not an abuse of discretion to give him the harshest sentence.

*L. Sufficient Evidence Supports the Finding that Walton Intended to
Cause Death or Serious Bodily Harm in the Frederick Carjacking.*

Walton argues that his carjacking conviction and related firearm conviction must be vacated because there was insufficient evidence that he intended for Frederick to be seriously harmed or killed in the plot to rob her at gunpoint. The carjacking statute prohibits "tak[ing] a motor vehicle" involved in interstate commerce "with the intent to cause death or serious bodily harm." 18 U.S.C. § 2119. Walton concedes that he conspired to rob Frederick, but he denies that the prosecution proved that he intended to "cause death or serious bodily harm." But "drawing all reasonable inferences and credibility choices in the Government's favor," *Browne*, 505 F.3d at 1253, we conclude that sufficient evidence supported the jury's finding that Walton had the requisite intent for his conviction.

The prosecution can prove the "intent to cause death or serious bodily harm," 18 U.S.C. § 2119, by proving that when the defendant demanded or took control of the car, he "possessed the intent to seriously harm or kill the driver *if necessary to steal the car*." *Holloway v. United States*, 526 U.S. 1, 12 (1999) (emphasis added). It is not necessary that the defendant expect or desire that serious harm or death would result. *Id.* at 7. Frederick was robbed without being seriously harmed or killed, so the prosecution had to prove that the conspirators intended that she be seriously harmed or killed *if*, counterfactually, it had been necessary.

Walton acknowledges that he and Dickerson planned to bring a gang member who did not know Frederick to rob her at gunpoint, but he argues that the jury could not have reasonably found that his intent was that the robber use that gun if necessary. Dickerson testified that Walton assured him that he would use his authority as Governor to ensure that Frederick would not be harmed. And Walton argues that a robber who intended to use deadly force to ensure the success of the robbery would have shot Frederick when she attacked him. Both Frederick and Dickerson testified that they thought the robber would have used his gun if he had not been instructed that he could not.

Pointing a gun at someone and demanding money is the kind of evidence on which prosecutors may rely to prove the *mens rea* for carjacking. *See, e.g., United States v. Douglas*, 489 F.3d 1117, 1128 (11th Cir. 2007), *abrogated in part on other grounds by Perry v. New Hampshire*, 565 U.S. 228, 237–38 (2012); *United States v. Diaz*, 248 F.3d 1065, 1097–98 (11th Cir. 2001). And drawing all inferences against Walton, as we must, *Browne*, 505 F.3d at 1253, the jury's verdict was reasonable, even if it was "not inevitable," *id.* A jury was not required to credit the testimony of Dickerson about the importance of protecting his girlfriend when he orchestrated a scheme to have her robbed at gunpoint. Dickerson's testimony was probative of Walton's intent only if the jury believed both Dickerson's account of what Walton said *and* that Walton told Dickerson the truth.

Nor is Frederick's resistance—or the lack of a more forceful response to it—decisive. The robber knew that Dickerson was in on the plan, so he knew that Dickerson would not assist Frederick, who was not as much of a threat by herself. He was also willing to use enough force to kick her out of the car while it was moving, suggesting he did not share Dickerson's supposed concern for Frederick's safety. A jury could have reasonably found that the robber declined to use force sufficient to seriously harm or kill Frederick only because it was unnecessary, not because he was told he could not use that force.

*M. Caldwell's Conviction Under the Armed Career Criminal Act and His Sentence Must Be Vacated.*

After briefing closed in this appeal, we granted Caldwell permission to file a supplemental brief based on intervening precedent to challenge his conviction for using a firearm "during and in relation to a crime of violence, that is[,] the robbery of E[ric] W[ilder]." Count 17 of the indictment contemplated that the offense of attempted Hobbs Act robbery, 18 U.S.C. § 1951, is a "crime of violence" within the meaning of the Armed Career Criminal Act, *id.* § 924(c)(3)(A). But the Supreme Court recently held in *Taylor* that attempted Hobbs Act robbery is not a "crime of violence" under section 924(c). 142 S. Ct. at 2020. So we must vacate Caldwell's conviction. We remand for the district court to resentence Caldwell for his remaining counts of conviction. *See United States v. Fowler*, 749 F.3d 1010, 1017 (11th Cir. 2014).

## IV. CONCLUSION

We **VACATE** Caldwell's conviction on count 17 of the indictment and his sentence and **REMAND** for resentencing. We **AFFIRM** all the other convictions and sentences.